UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

DONALD TIMM & MARY TIMM,            )
                                    )
    Plaintiffs,                     )
                                    )
    v.                              )   NO. 2:14CV232-PPS
                                    )
GOODYEAR DUNLOP TIRES NORTH         )
AMERICA LTD, *et al.*,              )
                                    )
    Defendants.                     )

## **OPINION AND ORDER**

Donald and Mary Timm were seriously injured after they lost control of their Harley-Davidson motorcycle and crashed into a highway barricade. They claim that the crash was the result of a defective tire and motorcycle and that their injuries were made worse because of the defective helmets they were wearing. Each of the defendants has moved for summary judgment on the Timms' claims. This order relates only to the "helmet" related defendants and claims. An order on the other pending motions will be forthcoming.

### **Background**

On July 10, 2013, the Timms embarked on a cross-country trip from their home in Dyer, Indiana to Salt Lake City, Utah, on their Harley-Davidson Ultra Classic. Mr. Timm was driving; Mrs. Timm was his passenger. [DE 305-7 at 5-6.] Before crossing into Nebraska, a state that requires motorcycle riders to wear helmets, the Timms stopped and put on their "Ultra Low Profile Outlaw Motorcycle Half Helmets" [DE 288-4 at 10-12; DE 305-7 at 6], which they had purchased two years before the accident. While

driving through Nebraska on Interstate 80, and traveling approximately 70 to 75 miles per hour, the tire on the Timms' motorcycle suddenly went flat. [DE 288-4 at 6, 16.] Mrs. Timm noticed that the back end of the motorcycle began "hopping." She asked her husband what was happening, and he responded that he couldn't control the back end. [DE 288-4 at 6-8; DE 305-7 at 6.] Eventually, Mr. Timm lost control of the motorcycle; they crossed two lanes of traffic and crashed into a concrete median barrier. An eyewitness to the crash estimated that the Timms struck the median while traveling somewhere between 55 and 65 miles per hour. [DE 288-3 at 6-9.] The same witness also reported that Mrs. Timm came off the motorcycle and landed on the ground, while Mr. Timm slid along the concrete shoulder lane, still connected to the motorcycle, and came to rest along the barrier. [DE 288-3 at 5-9.]

As one might imagine, the Timms' injuries were severe. Mrs. Timm was treated after the accident for a head injury consisting of a hematoma on the right side of her head. She experienced a loss of consciousness at times. In addition to the head injury, she suffered a fracture of her right humerus, a laceration to her left knee, and road rash abrasions. [DE 305-9; DE 288-2 at 9-10, 17-18.] Mr. Timm suffered a traumatic brain injury, significant facial fractures, and other head injuries, such as scalp lacerations and swelling. He also suffered an injury to his cervical spine. [DE 305-8]

As noted earlier, the Timms were both wearing half helmets at the time of the accident. Half helmets cover the top of the user's head and are secured by a chin strap.

They offer less coverage than full-face helmets, which cover the user's entire head and extend over the user's chin. [*See* DE 288-2 at 11-13.]

Two years before the accident, in June 2011, the Timms had purchased two Ultra Low Profile Outlaw Motorcycle Half Helmets, a size medium for Mrs. Timm and size large for Mr. Timm, from the website LeatherUp.com. [DE 305-7 at 4.] When the Timms received the helmets, they discovered that each was too small for its intended user. Mrs. Timm kept the size large helmet but returned the medium-sized helmet. [DE 305-7 at 4-5.] Although Mr. Timm attempted to purchase a larger helmet for himself from the same website, the helmet was not available on LeatherUp.com. As a result, Mr. Timm purchased the larger helmet through a website called MotorcycleCenter.com. [DE 305-7 at 4-5.]

There are a number of parties being sued relative to the claim that the Timms' helmets were defective so let's start by identifying the players. LeatherUp.com is owned by an internet retailer named Nanal, Inc. Nanal does not own the website from which Mr. Timm ultimately purchased his helmet, MotorcycleCenter.com. [DE 213 at 2-3; DE 299-1 at 3; DE 305-3 at 55, 84.] For this reason, Nanal, as well as the individual Nanal defendants, cannot be liable for any injuries suffered by Mr. Timm. The individual defendants are Albert Bootesaz, Doris Bootesaz, and Nahid Botehsaz. They were all officers, directors, shareholders, and/or employees of Nanal during all relevant years in question (2011 to 2015). [DE 299-1, 299-2, 299-3.] The helmet vendor is Tegol. It imported and distributed the Outlaw motorcycle helmets purchased by the Timms.

3

[DE 142 at 5.] Arash Aziz-Golshani (also sometimes referred to in this case as Aaron Golshen) is the President and sole shareholder of Tegol. [DE 288-7 at 3.] Kasra Shahrokshahi is an outside accountant for Tegol. [DE 288-8 at 4-6.] There is yet another defendant by the name of Paul Comeau, but his role in the events relating to the helmets is somewhat opaque. Mr. Comeau resides in Canada and he is proceeding *pro se* in this matter. Comeau testified that he is a "facilitator" and that he "put[s] customer and factory together." [DE 305-3 at 97.] It appears that he acted as a sort of intermediary between the Chinese factories that manufactured the helmets and the vendor Tegol. [*See* DE 305-3 at 97-98.]

Following the accident, Mrs. Timm discarded her helmet, which she stated contained many scratches and skidmarks and was cracked on the right side. [DE 305-7 at 7.] Mr. Timm's helmet was not discarded, but no one has performed tests of any kind on either of the helmets involved in the accident. [DE 307-1 at 10-11.]

A few months later, while Mr. Timm was still undergoing medical treatment, the Timms received a letter from Tegol, informing them that Tegol was instituting a recall of the helmets they had worn during the accident. [DE 305-7 at 7-8.] A total of twelve Outlaw helmets distributed by Tegol had apparently failed testing conducted by the National Highway Safety Administration. After being notified of the helmets' failure to pass testing, Tegol recalled the helmets. [DE 305-4 at 68-69.] In the recall notice, Tegol warned users that the helmets had failed to conform to certain Department of Transportation standards, and that "[b]y wearing a noncompliant helmet, the user may

not be adequately protected in the event of a crash, increasing the risk of personal injury." [DE 305-4 at 72.] The letter further advised helmet purchasers to stop using the helmet immediately. [DE 305-4 at 72.]

## Discussion

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the Court construes "all facts and reasonable inferences from the record in the light most favorable to [ ] the non-moving party." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

The parties agree that the substantive law of the state of Indiana applies to this action. [DE 198.] The Indiana Products Liability Act ("IPLA") governs all actions brought by a user or consumer against a manufacturer for physical harm caused by a product, regardless of the legal theory upon which the action is brought. Ind. Code. § 34-20-1-1; *Piltch v. Ford Motor Co.*, 778 F.3d 628, 632 (7th Cir. 2015). Thus, although the Timms have asserted numerous claims of both strict liability and negligence, including design defect, manufacturing defect, failure to warn, their claims are all subsumed by the IPLA. *See Atkinson v. P&G-Clairol, Inc.*, 813 F. Supp. 2d 1021, 1023-24 (N.D. Ind. 2011).

Under the IPLA, the plaintiff must establish that "(1) he or she was harmed by a product; (2) the product was sold in a defective condition unreasonably dangerous to any user or consumer; (3) the plaintiff was a foreseeable user or consumer; (4) the defendant was in the business of selling the product; and (5) the product reached the consumer or user in the condition it was sold." *Bourne v. Marty Gilman, Inc.*, 452 F.3d 632, 635 (7th Cir.2006); *see also* Ind. Code § 34–20–2–1. A plaintiff can satisfy the second element by showing a design defect, a manufacturing defect, or a failure to warn. *Piltch*, 778 F.3d at 632.

The IPLA imposes a negligence standard for claims of defective design and failure to warn. "[T]he party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product or in providing the warnings or instructions." Ind. Code § 34-20-2-2. To prevail on a negligence claim, the plaintiff must establish: "(1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach." *Weigle v. SPX Corp.*, 729 F.3d 724, 731 (7th Cir. 2013) (quoting *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007)).

Claims of manufacturing defects, on the other hand, are based on strict liability. To succeed on a manufacturing defect claim, the plaintiff must prove that: "(1) the product was defective and unreasonably dangerous; (2) the defective condition existed at the time the product left the defendant's control; and (3) the defective condition was the proximate cause of the plaintiff's injuries." *Rushford*, 868 N.E.2d at 810.

Importantly, both strict liability and negligence require the Timms to prove proximate causation.

Proximate cause has two components: causation-in-fact and scope of liability. *Kovach v. Caligor Midwest*, 913 N.E.2d 193, 197 (Ind. 2009). To establish factual causation, the plaintiff must show that "but for" the defendant's allegedly tortious act or omission, the injury at issue would not have occurred. *Id.* at 197-98. The scope of liability doctrine asks whether the injury was a natural and probable consequence of the defendant's conduct, which, in the light of the circumstances, should have been foreseen. *Id.* at 198.

The Timms do not allege that the helmets caused the motorcycle crash. Instead, their theory is that a defect in the helmets caused their injuries to be worse than they otherwise would have been had they not been wearing a defective helmet. This is an invocation of the "crashworthiness" doctrine which "expands the proximate cause requirement to include enhanced injuries." *Green v. Ford Motor Co.*, 942 N.E.2d 791, 793 (Ind. 2011); *see also Whitted v. Gen. Motors Corp.*, 58 F.3d 1200, 1205-06 (7th Cir. 1995). The issue of proximate cause does not always require expert testimony, *see U-Haul Intern., Inc. v. Nulls Machine & Mfg. Shop*, 736 N.E.2d 271, 285 n.3 (Ind. Ct. App. 2000), but expert testimony is required where the issue is beyond the understanding of a layperson. *Piltch*, 778 F.3d at 632.

It is undisputed that the Timms have offered no expert witness on the enhanced injury caused by the allegedly defective helmets. Instead, they tell me that "[i]f allowed to proceed to trial, plaintiffs will take videotaped evidence depositions of the medical

7

experts [who] provided their care for presentation to the jury." [DE 305 at 19.] The time for discovery has closed. It is not enough for the Timms to promise additional evidence later. If this were a poker game it would be time to turn your cards over. As one court aptly put it, "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier a fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

The only evidence the Timms have put forward to show that the helmets enhanced their injuries are medical records showing the extent of their injuries. Based on this evidence, it's clear that their injuries were significant. But the question is not how bad their injuries were – it's what injuries were the result of the motorcycle crash and what injuries were the enhanced injuries caused by the allegedly defective helmets. For a lay person to undertake this inquiry, unassisted by expert testimony, would require him to engage in pure speculation. *See Piltch*, 778 F.3d at 634. Indeed, this was the precise situation presented in *Piltch*. In that case – based on manufacturing and design defect claims related to two air bags' failure to deploy in an accident – the plaintiffs failed to present expert testimony as to their injuries. The Seventh Circuit held that, without any expert testimony, a "lay juror could not distinguish between the injuries caused by the collision and the enhanced injuries caused by the air bags' failure to deploy without engaging in pure speculation." *Id.* So too here, a lay juror would not be able to distinguish between the injuries caused by the motorcycle accident and the

8

enhanced injuries caused by the alleged defect in the helmets without engaging in speculation.

What's more, the Helmet Defendants have put forth their own expert, Dr. Harry Smith, who opined that the Timms' injuries are exactly the type of injury he would expect to see in a motorcycle accident like this one, "irrespective of the make or model of Department of Transportation compliant motorcycle half helmet they were wearing." [DE 288-1 at 8.] In particular, Dr. Smith opined that Mr. Timm "incurred injuries I would expect from wearing any half helmet in a high speed crash" [DE 288-2 at 15], that his brain and extra-cranial injuries would likely have occurred irrespective of helmet type, and that his other injuries were outside the zone of protection of any helmet. [DE 288-2 at 16-17.] As to Mrs. Timm, Dr. Smith stated that her head injuries, which included loss of consciousness and swelling, "could be expected to have occurred through the use of any governmental approved motorcycle helmet on the market." [DE 288-1 at 7.] Dr. Smith's conclusions remain unrebutted. By failing to designate an expert, the Timms are essentially asking a lay juror to not only take their word for it that their injuries were worse because of the helmets they were wearing, but also to disregard an expert's testimony to the contrary.

Proximate cause also dooms the Timms' failure to warn claim. Even assuming the Helmet Defendants provided a warning that would have caused the Timms to choose a different helmet altogether, the Timms must still show that the danger that would have been prevented by an appropriate warning was the danger that

9

materialized in their case. *Kovach*, 913 N.E.2d at 199. As Dr. Smith opined, any choice of helmet by the Timms would have resulted in the same injuries that the Timms ultimately suffered, and the Timms have not offered any evidence showing otherwise. As a result, the Timms cannot show that, but for the lack of an adequate warning, they would not have suffered precisely the same injuries.

Moreover, the Timms' failure to warn claim suffers from several other fatal flaws. In their complaint, the Timms allege that the Helmet defendants failed to warn in two ways: (1) by failing to warn about the dangers of the helmets, and (2) by failing to submit appropriate information concerning the already-distributed helmets. [DE 110 at 41-42.] The Helmet Defendants have moved for summary judgment on all of the Timms' claims against them, including the failure to warn claim. The Timms, however, do not address those arguments in their response. Therefore, the Timms have essentially conceded the Helmet Defendants' points, as typically "[f]ailure to respond to an argument ... results in waiver." *Bonte v. U.S. Bank N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

Notwithstanding waiver, the Timms furthermore have not articulated what dangerous condition they needed to be warned about or what the warning should have said or how it should have been conveyed. This type of evidence is essential. *See Morgen v. Ford Motor Co.*, 797 N.E.2d 1146, 1152 (Ind. 2003); *Nissen Trampoline Co. v. Terre Haute First Nat'l Bank*, 358 N.E. 2d 974, 978 (Ind. 1976). In essence, the Timms' failure to warn claim really boils down to this: the Department of Transportation testing of

10

certain Outlaw helmets revealed a dangerous condition that the Helmet Defendants should have warned the Timms about. However, this claim fails because Indiana courts haven't recognized a post-sale duty to warn under the IPLA. *Tober v. Graco Children's Prods., Inc.*, 431 F.3d 572, 579 (7th Cir. 2005); *see also Fowler v. Werner Co.*, 2014 WL 2605341, at *3 (N.D. Ind. June 10, 2014).

The Timms also allege numerous facts related to the recall of the helmets. To the extent the Timms mean to assert a claim of negligent recall, they are unable to point to any case in which Indiana courts have recognized such a claim. I also have not uncovered any support for that position. Others courts have had similar difficulty. *See, e.g., Tober v. Graco Children's Prods., Inc.*, 2004 WL 1987239, at *9 (S.D. Ind. July 28, 2004), *aff'd* 431 F.3d 572 (7th Cir. 2005) ("Plaintiffs do not cite to any Indiana state law cases that indicate the existence of a separate 'negligent recall' cause of action, and the Court has not uncovered any support for their position."). It would be inappropriate for a federal district court sitting in diversity to create a new cause of action under state law. *See Moss v. Crosman Corp.*, 136 F.3d 1169, 1173-74 (7th Cir. 1998). Therefore, summary judgment must be granted on the Timms' claim of negligent recall.

Lastly, the Timms claim that the Helmet Defendants failed to comply with NHTSA regulations. But they have not identified any statute that provides, or a case recognizing, a private right of action. To the contrary, the Timms seemingly acknowledge that the IPLA provides the sole cause of action. [DE 110 at 42-43 ("[The Helmet Defendants] failed to comply with regulatory requirements in violation of the

11

Indiana Product Liability Statute....").] But failure to comply with federal regulations is not a cause of action under the IPLA. The Motor Vehicle Safety Act, from which the NHTSA regulations arise, also does not confer a private cause of action. *See Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 522 (11th Cir. 2000). For that reason, summary judgment on this claim is appropriate.

Because the claims concerning the helmets – based on alleged defects, negligent recall, and failure to comply with federal regulations – fail, summary judgment on the claims against the individual helmet defendants, who are officers, employees, or agents of the corporate defendants, must also be granted.

There is one issue remaining as it relates to the helmet defendants. Tegol has brought a cross claim against Paul Comeau. The first count, based on indemnification, does not survive as a matter of course now that summary judgment has been granted on the Timms' claims against Tegol. The second claim is not based on indemnification, but rather on contract and tort law. Comeau moved for summary judgment on the cross claim, but Tegol did not respond. It's not clear to me whether Tegol still intends to bring this claim, and based on Mr. Comeau's motion, it's also not clear whether summary judgment is appropriate. Therefore, Tegol must advise the Court within 7 days whether it intends to pursue the cross claim against Mr. Comeau. If Tegol intends to proceed, it must address this Court's jurisdiction for that claim.

## Conclusion

Defendant Tegol's Motion for Summary Judgment [DE 286] is GRANTED.

Individual Tegol Defendants' Motion for Summary Judgment [DE 289] is GRANTED.

Defendant Nanal and Individual Nanal Defendants' Motion for Summary Judgment [DE 294] is GRANTED.

Defendant Paul Comeau's Motion for Summary Judgment [DE 291] is GRANTED as explained in this Opinion.

Defendant Tegol's Rule 56 Motion to Strike Exhibits Tendered by Plaintiffs [DE 313] is DENIED AS MOOT.

Cross-claimant Tegol is ORDERED to advise the Court whether it intends to pursue its cross claim against Cross-defendant Paul Comeau within 7 days of the date of this Opinion.

SO ORDERED.

ENTERED: February 15, 2018

　　　　　　　　　　　　　　　　　　　　/s/ Philip Simon
　　　　　　　　　　　　　　　　　　　　PHILIP P. SIMON, JUDGE
　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT COURT