| | |
|---|---|
| DONALD TIMM; MARY TIMM, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>GOODYEAR DUNLOP TIRES NORTH )<br>AMERICA LTD, et al., )<br>)<br>Defendants. ) | NO. 2:14CV232-PPS |

## OPINION AND ORDER

Mr. and Mrs. Timm were seriously injured in a motorcycle accident and bring this products liability action against Harley-Davidson, the motorcycle manufacturer, and Goodyear Dunlop, the tire manufacturer. Harley-Davidson and Goodyear Dunlop contend that the experts identified by the Timms are not qualified to give the proposed testimony pursuant to *Daubert*. They have also moved for summary judgment. Because the experts's opinions are not reliable, I will grant the defendants' *Daubert* motions, and as a consequence, will also grant summary judgment in favor of Harley-Davidson and Goodyear.

### Background

On July 10, 2013, the Timms embarked on a cross-country trip from their home in Dyer, Indiana on their Harley-Davidson Ultra Classic. Mr. Timm was driving; Mrs. Timm was his passenger. [DE 305-7 at 5-6.] While driving through Nebraska on Interstate 80, and traveling approximately 70 to 75 miles per hour, the tire on the

Timms' motorcycle suddenly went flat. [DE 288-4 at 6, 16.] Everyone agrees that the tire was punctured, likely by a road hazard, which caused the tire to lose pressure. [DE 297-2 at 6.] Mrs. Timm noticed that the back end of the motorcycle began "hopping." She asked her husband what was happening, and he responded that he couldn't control the back end. [DE 288-4 at 6-8; DE 305-7 at 6.] Tragically, Mr. Timm lost control of the motorcycle, and the Timms crossed two lanes of traffic, eventually crashing into a concrete median barrier.

An eyewitness to the crash estimated that the Timms struck the median while traveling somewhere between 55 and 65 miles per hour. [DE 288-3 at 6-9.] The same witness also reported that Mrs. Timm came off the motorcycle and landed on the ground, while Mr. Timm slid along the concrete shoulder lane, still connected to the motorcycle, and came to rest along the barrier. [DE 288-3 at 5-9.]

The Timms' injuries were severe. Mrs. Timm was treated after the accident for a head injury, consisting of a loss of consciousness and hemotoma. In addition to the head injury, she suffered a fracture of her right humerus, a laceration to her left knee, and road rash abrasions. [DE 305-9; DE 288-2 at 9-10, 17-18.] Mr. Timm suffered a traumatic brain injury, significant facial fractures, and other head injuries, such as scalp lacerations and swelling. He also suffered a cervical spine injury. [DE 305-8.]

The Timms were riding their 2006 Harley-Davidson Ultra Classic motorcycle on this trip. The rear tire was a Goodyear Dunlop D402 MU8516, M/C 77H tire manufactured by Goodyear and branded with the name Harley-Davidson. [DE 297-2 at

6; DE 110 at 19.] The Timms had purchased the tire in November 2012, as a replacement tire. The Timms allege that Harley-Davidson sells and distributes the Goodyear tire, but it's not clear from whom the Timms actually purchased their replacement tire. [*See* DE 110 at 19.]

This case involves some nitty-gritty details about tires and motorcycles, and the mechanics are not exactly straightforward. In layman's terms, what happened is the motorcycle's rear tire was punctured by a road hazard, it began to deflate and eventually became unseated from its rim. The key question is whether the tire became unseated from the rim thus causing the accident, or vice versa, whether the crash of the motorcycle is what caused the tire to unseat from the rim. As one might imagine this is a difficult and technical question to answer, requiring expert testimony.

Before getting into the details it's necessary to understand a little bit about motorcycle and tire terminology. (For a good description of the construction of a radial ply tire, albeit a car tire not a motorcycle tire, *see Kumho Tire Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999).) The D402 tire at issue in this case is a bias ply tire constructed of three polyester plies and two fiberglass belts beneath the tread. The inner liner holds the air within the tire. The bead is the edge of the tire that sits on the bead seat on the wheel rim. The bead of the tire is made of steel bands woven together in a hoop, and components of the tire are wrapped around the bead. The chafer strip reinforces the beads and protects the cord body plies. Here is a drawing of the tire:



The D4702 is a tubeless tire.  It sits, and stays, on the wheel rim by what's called an interference fit.  The diameter of the bead base on the tire is slightly smaller than the diameter of the bead seat on the rim.  This interference fit, in combination with the air pressure in the tire, holds the tire in place on the rim. The dimensions of the bead base on the tire and the bead seat on the rim are critical, and the tolerances are tight. Here are additional drawings of the tire components and the interference fit described above:





And here is the actual tire taken from the Timms' motorcycle showing it unseated from the rim.





      The Timms' theory of the defect in this case is that there was excess "flash" in the bead area and too thin rubber covering the chafer strip which, in combination with the rim, resulted in an insufficient amount of rubber in the bead area, weakening the

interference fit between the tire and the rim.  This, the Timms say, allowed the bead on one side of the tire to unseat – or, come free – from the rim when the tire lost its pressure after it was punctured.  Bead flash is a very thin layer of rubber that is created when the tire is cured or vulcanized into its final shape.  Goodyear considers the condition cosmetic and often shaves the excess flash off of the tires before distributing them.

There is a second and somewhat unrelated issue in this case. The Timms also claim that the Harley-Davidson motorcycle should have been equipped with a tire pressure monitoring system ("TPMS").  TPMS is an electronic system designed to monitor the air pressure inside tires.  It reports this information in real time to the driver through a number of possible different methods, including a gauge, pictogram display, or warning light.

In support of their theory, the Timms have proposed two experts – William Woehrle, a tire expert, and Dr. Daniel Lee, an accident reconstructionist.  Woehrle seeks to offer a number of opinions that are relevant to the Timms' claims.  First, if allowed, Woehrle will testify as to the cause of the accident.  He says that Mr. Timm lost control of the motorcycle as a result of "a sudden and total deflation of the rear tire." [DE 297-2 at 5.] According to Woehrle, the tire was punctured in the tread region, which led to "a steady and relatively controllable loss of inflation pressure." [DE 297-2 at 5.] As the pressure dropped, "at some point, while still traveling straight ahead, the right side bead became unseated." [DE 297-2 at 5.] This caused a very severe vibration and

"violent distortions of the tire on the wheel," creating a situation in which "it would not be reasonable to expect the operator to maintain control of the motorcycle." [DE 297-2 at 5.]

Woehrle opined that the bead unseating was caused by three independent conditions, which "combined to create an unacceptably low resistance to dynamic bead unseating for the subject tire/wheel assembly." [DE 297-2 at 5.] According to Woehrle:

> The subject tire bead on the right side was made more vulnerable to unseating from the rim flanges as a result of very severe toe ring flash between the bead heel and top of the bead face. This is a manufacturing defect, which would have been readily visible during the final visual inspection of the finished tire in the factory.
>
> In addition, the subject tire has an extremely thin layer of skim rubber over the chafer strip in the bead region. This reduces the margins for any deviation in dimensions and contour in this critical bead region, in order to achieve satisfactory bead fitment to the rim flange.
>
> The situation was further exasperated by the fact that the subject rim was at the very minimum value of the allowable and standardized tolerance for rim bead seat diameter.

[DE 297-2 at 5.]

Woehrle arrived at this conclusion by conducting a physical examination of the tire and wheel. He analyzed the tire to determine whether there was any "abuse on the part of the owner," and in particular looked for tire impact damage, punctures and repairs, age, excessive tread wear, and rim deformities. He found that the tire had been punctured but not repaired, which he ruled was the proximate cause for the pressure loss in the tire. There were no other abuse issues identified in his examination. [DE 297-

2 at 6.] His physical examination also revealed a "very severe toe ring flash on the SS bead face." [DE 297-2 at 7.] He further observed that the "skim rubber over the square woven chafer fabric in both beads was so thin that the fabric was nearly protruding through the skim rubber." [DE 297-2 at 7.] Woehrle found that the motorcycle rim's dimensions were within the standardized tolerances set forth by the Tire and Rim Association, which he identifies as the applicable standardizing body in the United States. [DE 297-2 at 8.]

His other opinion concerns Harley-Davidson's failure to equip the Timms' motorcycle with TPMS. Woehrle opined that Harley-Davidson should have installed a TPMS on the motorcycle because it would have made the motorcycle safer. In particular, Woehrle's opines that:

> If either Harley Davidson or Goodyear Dunlop truly believe that a flat tire that has not yet catastrophically failed, with its beads that remain seated, on a motorcycle traveling on a smooth, straight roadway at normal highway speeds, poses a severe motorcycle control issue, then both defendants are negligent in not having Tire Pressure Monitoring Systems (TPMS) installed as standard equipment on such motorcycles.

[DE 297-2 at 16.] He further stated that the "TPMS technology and availability existed long before the subject tire and motorcycle were made." [DE 306-1 at 38.] Woehrle stated that it is reasonable to conclude that the accident would not have happened if the motorcycle had been equipped with TPMS. [DE 306-1 at 38.]

In support of his opinion that the motorcycle should have had TPMS, Woehrle describes how he conducted an experiment by purchasing an aftermarket TPMS and

installing it on a Harley-Davidson motorcycle. He stated that it worked "flawlessly." [DE 300-3 at 4.] Woehrle compares the availability and safety of TPMS on motorcycles to that of passenger cars and trucks, which he says have been regulated for nearly a decade. Finally, he notes that "[n]umerous motorcycle manufacturers offer TPMS today." [DEE 300-3 at 4.]

Dr. Lee is an accident reconstructionist who opined that the Timms' tire hopped due to bead unseating and this caused the loss of control. [DE 301-2 at 10, 12.] He concluded that "Donald Timm did not contribute to the crash." [DE 301-2 at 12.] According to Dr. Lee, the "initial wobble, fishtailing, and hops" as reported by Mrs. Timm, were "due to a rear tire failure which made the Harley uncontrollable and resulted in the crash and the related injuries." [DE 301-2 at 3.] His position is evidenced, he says, by the marks on the roadway and the condition of the tire and wheel combination. [DE 301-2 at 10.]

In addition to his "hopping" and bead seating opinion, Dr. Lee offered several opinions related to the conditions of the roadway and the Timms' motorcycle on the day of the accident. For example, he opined that the Timms' motorcycle was in "sound mechanical condition," that there were good weather conditions on the day of the accident, and the roadway was in "a reasonably safe condition." [DE 301-2 at 12.]

Dr. Lee bases all of these "opinions" on his review of the police report, the Timms' and a witness' deposition, Woehrle's report, and the tire, as well as discussions with Woehrle and the Timms' attorney. [DE 301-2 at 5.] At the time he issued his expert

report, Dr. Lee had not inspected the accident scene or the motorcycle [DE 298-1 at 11], though by the time he testified, he had visited the accident scene.

At his deposition, but not in his initial expert report, Dr. Lee also offered his opinion as to TPMS, and though he initially testified that he did not know what TPMS was, he later opined that "every manufacturer should have [TPMS] but they don't." [DE 301-1 at 5.] Then, in an affidavit sworn to and submitted after the defendants' motions for summary judgment and motions to exclude his testimony, Dr. Lee added to his conclusions, stating that "Goodyear is aware that tire pressure and temperature are critical elements. A good starting point would be for Harley Davidson and Goodyear to require existing pressure monitoring systems to be installed on all motorcycles equipped with Goodyear tires." Dr. Lee notes that he has purchased five new Harley-Davidson Ultra motorcycles, and not one has been equipped with TPMS, even though his current vehicles – not motorcycles – have it. He also cites a *USA Today* article discussing Goodyear's testing of smart tires that could potentially relay condition information, such as pressure and temperature, in support of his opinion that Goodyear is aware that tire pressure is a critical element. [DE 308-1.]

Before me are a slew of motions, including two motions for summary judgment filed by both Goodyear and Harley-Davidson, as well as motions to exclude both experts' testimony and motions to strike several of the Timms' filings. After receiving the parties' briefing related to the Timms' experts, I held a *Daubert* hearing, in which I

heard testimony directly from Mr. Woehrle, to address the reliability of his opinions. All of these motions are now ripe for my decision.

## Discussion

*Motions to Exclude Expert Testimony*

Harley-Davidson and Goodyear have moved to exclude the opinions of the Timms' two proposed experts, William Woehrle and Daniel Lee. Because the admissibility of the experts' testimony is pivotal to the viability of the Timms' claims, I will address it first.

Let's start with some basics. Federal Rule of Evidence 702 governs the admissibility of expert testimony. It states, in relevant part, that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. The Rule "also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case." *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010). The district court must perform a "gatekeeping" function before admitting scientific testimony in order to ensure that "all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). As a threshold matter, the district court must determine

(1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

The first step is to analyze the reliability of the expert. In doing so, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions. *Id.* Rule 702 contemplates that an expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Thus, in determining whether a proposed expert is qualified, a court may consider the proposed expert's full range of practical experience, as well as academic or technical training. *Smith*, 215 F.3d at 718. But "even a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Id.* (internal quotation marks and brackets omitted). This means that a court "must rule out subjective belief or unsupported speculation." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (internal quotation marks omitted).

In *Daubert*, the Supreme Court identified four factors that are pertinent to the reliability inquiry: (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether it has been generally accepted within the relevant scientific community. 509 U.S. at 593-94. The inquiry is flexible and must focus solely on the principles and methodologies, not the conclusions they generate. *Id.* at 594. No single factor is either

required in the analysis or dispositive as to its outcome. *See Kumho Tire Co.,* 526 U.S. at 141.

If the district court is satisfied that the expert's testimony is reliable, the next step is to determine whether the testimony is relevant. In making this determination, the court must consider whether the testimony assists the trier of fact in understanding the evidence or in determining a fact at issue. *Cummins,* 93 F.3d at 368.

### William Woehrle

I'll start with William Woerhrle. Goodyear and Harley-Davidson seek to exclude two opinions of Woehrle's: (1) his opinion as to how the tire became unseated from the rim; and (2) his opinion concerning TPMS.

Woehrle's first opinion concerns the cause of Mr. Timm's losing control of the motorcycle and the unseating of the tire from the rim. As explained above, Woehrle concluded that the tire had been punctured, which caused the loss of air, but that after the puncture occurred, while the Timms were still traveling straight ahead, the right side bead became unseated from the rim. This unseating, Woehrle says, was caused by very severe flash and an extremely thin layer of skim rubber over the chafer strip in the bead region. The situation was made worse, according to Woerhle, by the fact that the motorcycle rim was at the lowest allowable tolerance for bead seat diameter.

Goodyear and Harley-Davidson argue that each of Woehrle's contributing conditions opinion is not reliable for a multitude of reasons, and they point to his own deposition testimony in support. Woehrle admitted in his deposition that he has not

tested his opinion that excess flash can cause rubber to pull away from the chafer strip or that flash affects bead seat retention. [DE 297-1 at 24.] Instead, he conceded that identifying how much rubber was pulled away from the chafer strip in the Timms' tire, as a result of bead flash, is not capable of objective ascertainment. [DE 297-1 at 22, 24.] What's more, he agreed that even if he were to test his theory, any test would produce a high rate of error. [DE 297-1 at 42.]

Woehrle is unable to point to any scientific studies, literature, or experiments that support his opinion that excess flash in the bead area can pull rubber away from the chafer strip and then lead to bead unseating. [DE 297-1 at 24.] The one paper he cites to does not even mention flash as being related to the issue of bead fit. [DE 297-1 at 24.] Instead of pointing to a scientific study, Woehrle testified that his opinion is a "fundamental principle" and is "just straightforward and intuitive." [DE 297-1 at 24.]

Likewise, Woehrle acknowledges that his second opinion regarding the rubber in the chafer strip as being too thin is not based on any testing he, or anyone else, has done. Woehrle again is not aware of any scientific studies that support his opinion. Rather, his opinion as to what thickness the chafer strip needs to be is "just based on fundamental knowledge of the bead fitment and what would be reasonable rubber thickness in the bead region." [DE 297-1 at 27.] In other words, his opinion as to how thick chafer rubber should be is based on what *he thinks* is reasonable. Woehrle could not identify any scientific study or published material supporting his opinion as to how thick the chafer strip rubber should be. [DE 297-1 at 27.] Woehrle also opines that thin

rubber chafer can contribute to creating an unacceptable resistance to bead unseating, but he concedes that this opinion is also not supported by any testing he has done. Nor can he identify any scientific studies conducted by others that supports his theory. [DE 297-1 at 28.] It's not even supported by his own personal experience with motorcycle tires. [DE 297-1 at 28.]

With respect to Woehrle's third contributing condition opinion, Goodyear and Harley-Davidson challenge the basis for Woehrle's opinion that the motorcycle rim, which was at the minimum value of the allowable and standardized tolerance for rim bead seat diameter, combined with the other two conditions to create an unacceptably low resistance to dynamic bead unseating. To this point, Woehrle does not provide any peer-reviewed publications, studies, or testing to support his theory. And he holds his opinion despite acknowledging that the rim met the recognized industry standards. [DE 297-2 at 8 ("The subject rim's dimensions were found to be within the TRA [Tire & Rim Association] standardized tolerance.").]

These acknowledgments by Woehrle lead me to conclude that his testimony is not admissible because, notwithstanding the flexibility of the *Daubert* analysis, it fails to adhere to any of the *Daubert* guideposts. With due respect to Mr. Woehrle, his opinion about how the tire became unseated from the rim is the epitome of an *ipse dixit* — it's so because he says it's so.

First, Woehrle himself conceded that neither he nor anyone else has tested his theory that excess flash can pull rubber away from the chafer strip, diminishing

resistance to bead unseating, or that a rim within the industry standards could contribute to bead unseating. Second, he is unable to point to any scientific literature supporting – or even mentioning – his theory as to any one, let alone all three, contributing conditions.  Third, as to his opinion concerning excess bead flash, Woehrle indicates that it is not capable of objective ascertainment and the known or potential rate of error cannot be quantified.  As to the combination of the three factors, Woehrle conceded that he cannot quantify or test the impact each of the conditions had on bead unseating.  Finally, given all of the above, it's clear that his theory is not generally accepted in the community because no one else has thought to publish anything about it.

Woehrle's testimony at the *Daubert* hearing confirms my conclusion that his opinions are not based on any reliable, valid scientific method.  At the hearing, Woehrle testified in great detail about what he thought had caused the Timms' accident.  But when I asked him directly what he relied upon to arrive at his conclusion that excess flash and thin chafer rubber caused the unseating, he replied that it was an intuitive principle.  I further asked if there was *anything* — a treatise, industry papers, a controlled experiment, other experts, etc. — that he could point to that supports his opinion.  He replied that there was no empirical data or controlled experiments to buttress his opinions. [*See* DE 336.]

In sum, Woerhle's opinions appear to be based on nothing more than his subjective belief and unsupported speculation. It goes without saying that intuitive

principles are not enough to satisfy the strictures of Rule 702 and *Daubert.* Because Woehrle's testimony concerning the cause of the bead unseating does not meet the requirements of Rule 702 and *Daubert*, it must be excluded.

Harley-Davidson also seeks to exclude Woehrle's opinion regarding TPMS. It argues that he has no specialized knowledge, skill, experience, training, or education which would qualify him to offer opinion testimony regarding motorcycle TPMS. I agree. Woehrle is a tire expert, but he has no design or manufacturing experience with motorcycles. [DE 300-1 at 16.] From his resume, I can't identify *any* motorcycle-related training, education, or experience. [DE 306-2.] Woehrle has never tested any component of a motorcycle other than tires. [DE 300-1 at 17.] Woehrle testified that he also is not an expert in the design of TPMS for motorcycles, which is different than TPMS for automobiles, and he has conducted no research into the scientific literature on the topic. [DE 300-1 at 19.]

In addition to his lack of qualifications, Woehrle's opinions regarding TPMS are also not reliable because they are not based on scientifically valid methodologies. Rather, it seems to me that they lack *any* basis beyond his own speculation. Woehrle's lack of knowledge and failure to learn any information that would be relevant to his opinion tell the whole story. He admitted he didn't know what challenges exist for incorporating TPMS onto a motorcycle, and he didn't conduct any research on the topic. [DE 300-1 at 24.] He also didn't conduct any research into the scientific literature on TPMS for motorcycles. [DE 300-1 at 19.] He didn't know the cost, and again he didn't

conduct any research to learn the answer. Woehrle knew that the National Highway Traffic Safety Administration did not require TPMS to be installed on motorcycles. However, he admitted that he did not know whether the NHTSA had ever looked into this issue, and that he had "no idea" — beyond knowing that it wasn't required — "where they stand regarding their conclusions for regulation." [DE 300-1 at 18.]

Incredibly, in a line of questioning seemingly directed at the feasibility of Harley-Davidson including TPMS on a motorcycle in 2006, Woehrle stated that another motorcycle manufacturer had included TPMS on its motorcycles for a few years. The basis of this statement, however, was that someone (he couldn't remember the name) told him that. [DE 300-1 at 18.] Furthermore, when asked why there were no motorcycles in 2006 that were equipped with TPMS, Woehrle replied "this is an *assumption* on my part, but the issue was cost." [DE 300-1 at 10 (emphasis added).] So he effectively conceded that he was speculating. [DE 300-1 at 11.]

Most of the basis for his opinion is his assumption that, because cars have TPMS, motorcycles should too. But this just conflates TPMS on motorcycles with TPMS on automobiles — a topic that the Timms haven't even argued that Woehrle is qualified to testify about. For example, Woehrle couldn't offer any information regarding what device Harley-Davidson could have incorporated into the 2006 motorcycle. Instead, he stated that his starting point, "without carefully examining it," was to begin with what's on a passenger car. He testified "[l]ike I've had it on my passenger car for over a

decade. And [] I would expect that to be a good starting point for someone like Harley-Davidson." [DE 300-1 at 22.]

The fact that Woehrle drives a car that has been equipped with TPMS for decades cannot possibly be a reliable way to know whether Harley-Davidson should have installed TPMS on the Timms' motorcycle or whether it was negligent for Harley-Davidson not to do so. Instead, taking all of this together, it strikes me that Woehrle is offering "nothing but a bottom line," which "supplies nothing of value to the judicial process." *Zenith Elec. Corp. v. WHTV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

The only other possible basis of his opinion is an experiment he conducted in coordination with Dr. Lee. The details of this experiment are unclear, to say the least, but I gather that they purchased an aftermarket TPMS device, installed it on a motorcycle, and drove the motorcycle with the TPMS device around. [DE 300-3 at 4.] This experiment shows only that an aftermarket TPMS device can work on a motorcycle. This is clearly not relevant to the ultimate issue of whether Harley-Davidson should have equipped its motorcycle with TPMS, but I also don't see how this is relevant at all to any issue of fact presented in this case.

Based on Woehrle's lack of qualifications related to motorcycles generally and motorcycle TPMS in particular, and the lack of reliability in the methodologies he used to form the basis of his opinion, Woehrle's testimony regarding motorcycle TPMS fails to meet the requirements of Rule 702 and the standard set forth in *Daubert*. It therefore must be excluded.

*Dr. Daniel Lee*

Goodyear has moved to exclude Dr. Lee's opinion that the tire "hopped" due to bead unseating, causing a loss of control, as well as his accident reconstruction opinions, on the basis that these opinions are not reliable. The Timms notably did not bother to respond to Goodyear's motion. Instead, they responded only to Harley-Davidson's motion to exclude Dr. Lee's other opinion (related to TPMS), and they did not address any of Goodyear's arguments as to why Dr. Lee's other opinions are unreliable. I would be well within my discretion to exclude Dr. Lee on that basis alone, as failure to respond to an argument typically results in waiver. *See Bonte v. U.S. Bank N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). I will nonetheless consider Lee's opinion.

Dr. Lee is a former police officer who has his doctorate degree in Driver and Traffic Safety. For many years he was the Director of the Traffic Safety Program at Michigan State University. Dr. Lee is also an accident reconstructionist, and he has a number of opinions reconstructing the Timms' accident. That's all well and good, but Dr. Lee strays well beyond his expertise when he starts talking about tires. Dr. Lee opines that when a tire bead unseats, one half of the bead goes into the wheel well and the other half of the bead extends upward above the wheel flange. According to Dr. Lee, in our case, this is what caused the motorcycle to "hop" and Mr. Timm to lose control.

In support, Dr. Lee points to a static stage exhibition test he and Woehrle completed in another case. The details of this experiment are not entirely clear to me. In

that test, Dr. Lee and Woehrle "had a motorcycle with [] one side of the tire debeaded to show the lean angle from a debeaded tire on the rear." [DE 298-1 at 35.] It was a static test, meaning they were "moving forward at a slow speed to show the rise and fall of the motorcycle in terms of going from the portion of the tire that's in the wheel well." [DE 298-1 at 35.] But Woehrle and Dr. Lee did not have any photographs or documentary evidence for this experiment. [DE 297-1 at 47-48.]

Apart from this one test, Dr. Lee has not performed or been involved in any dynamic testing, i.e., a test replicating the actual conditions under which the bead would have come unseated, and he cannot point to any dynamic testing performed by anyone else, to identify what effect bead unseating would have on motorcycle controllability. [DE 298-1 at 36.] He also can't point to any other testing that supports his opinion that bead unseating would cause a motorcycle to hop. [DE 298-1 at 36.] He likewise cannot identify any scientific literature that supports his opinion [DE 298-1 at 36]; instead, his opinion is based, in part, on "common sense" [DE 298-1 at 48].

Even if I were convinced that Dr. Lee is qualified to render opinions about tires and how they can unseat from a rim, his methodology fails to meet the *Daubert* standard, in any event. The one test that Dr. Lee performed to validate his opinion was developed purely for the purpose of testifying in another case. This cuts against the reliability of the proposed testimony. *See* Fed. R. Evid. 702 Advisory Committee's Note (2000 Amendments) (suggesting another factor for courts to consider is whether the testimony relates to matters growing naturally and directly out of research they have

conducted independent of litigation or developed expressly for purposes of testifying). There also is no peer-reviewed or published material to support his theory that a bead that unseats from the rim causes hopping, and this theory has apparently never been tested.

I'll move now to Dr. Lee's opinions relating to TPMS which Harley-Davidson seeks to exclude. It is telling that Dr. Lee's original report makes no mention of TPMS for motorcycles. [*See* DE 301-2.] What is even more striking is the fact that during his deposition, he testified that he did not even know what TPMS is. [DE 301-1 at 3.] He had heard of it before, but he could not say what it was. [DE 301-1 at 3-4.] He also did not know whether the Federal Motor Vehicle Safety standards required TPMS on a motor vehicle. [DE 301-1 at 4.] Yet, later in his deposition, Dr. Lee rendered the opinion that motorcycles would be safer if they were equipped with TPMS and that every manufacturer should have TPMS, but they don't. [DE 301-1 at 5.] Despite this opinion, Dr. Lee conceded he did not know of any particular motorcycle that was equipped with TPMS, except he had "read somewhere where Honda's coming out with – but I can't say for sure." [DE 301-1 at 5.] He further testified that he had never seen a motorcycle that had been equipped with TPMS. [DE 301-1 at 5.]

I am dubious of Dr. Lee's qualifications on this topic. It is true that he has significant experience with motorcycles in a general sense — he teaches civilian motorcycle courses and courses concerning motorcycle accident reconstruction. He has also helped develop courses and has provided motorcycle certification training related

to motorcycle operation. [DE 308-2, 308-3.] But he has no experience or training with TPMS and none with motorcycle manufacturing or design. [DE 308-2.] It's clear from his deposition that he possesses no "scientific, technical, or other specialized knowledge" relevant to TPMS. To the contrary, at one point, he admitted knowing nothing about TPMS.

Harley-Davidson raised the issue of Dr. Lee's qualifications regarding motorcycle TPMS, but the Timms simply didn't respond to those arguments, beyond submitting Dr. Lee's resume and another newly sworn affidavit, which Harley-Davidson has moved to strike. But even if I considered the affidavit, what it seems to suggest is that Dr. Lee's qualification is his ownership of several vehicles that are equipped with TPMS. [DE 308-1.] Under that logic every single owner of a vehicle with TPMS would be qualified to offer an expert opinion.

But even if his qualifications were sufficient, there are significant problems with the reliability of his methodology. As with Woehrle, it's not at all clear what the basis of his opinion concerning TPMS is. Dr. Lee conducted one experiment that involved TPMS on a motorcycle, which I explained above involved an aftermarket TPMS device purchased from a retailer. There are a number of problems with this methodology, but the biggest one is that even Dr. Lee admits that the purpose of this evaluation was not to evaluate the TPMS. When asked "What tire pressure monitor did you evaluate in conjunction with that lawsuit?", Dr. Lee responded that "was not the purpose of evaluating the monitoring system." Rather, the TPMS was "there to warn us if we were

having a tire failure while we were testing. So no, I couldn't even tell you the brand name of it." [DE 301-1 at 11.] Besides, this test was conducted for purposes of litigation, a factor that again weighs against finding that his opinion is reliable. *See* Fed. R. Evid. 702 Advisory Committee's Notes to 2000 Amendments; *see also Smith v. I-Flow Corp.*, 2011 WL 12556366, at *2 (N.D. Ill. May 3, 2011) (legitimate, preexisting research unrelated to litigation provides "the most persuasive basis" for concluding that the opinions the expert expresses were derived by the scientific method) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)).

Beyond this experiment, Dr. Lee offered absolutely no support, evidence, or methodology to support his conclusion. His whole reasoning for his conclusion is that because he owns several vehicles that have TPMS, the motorcycle should have it too. He hasn't pointed to any studies, scientific literature, experiments, or peer-reviewed materials. This testimony is exactly the type of unsupported speculation that Rule 702 and *Daubert* is intended to protect against. Therefore, based on Dr. Lee's lack of motorcycle-related qualifications and the lack of reliability in his opinions, his testimony as it relates to TPMS is not admissible.

## Summary Judgment

With these rulings in mind, I turn now to the summary judgment motions filed by Goodyear and Harley-Davidson. Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists only

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the Court construes "all facts and reasonable inferences from the record in the light most favorable to [ ] the non-moving party." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

The Indiana Products Liability Act ("IPLA") governs all actions brought by a user or consumer against a manufacturer for physical harm caused by a product, regardless of the legal theory upon which the action is brought. Ind. Code. § 34-20-1-1; *Piltch v. Ford Motor Co.*, 778 F.3d 628, 632 (7th Cir. 2015). Under the IPLA, the plaintiff must establish that "(1) he or she was harmed by a product; (2) the product was sold in a defective condition unreasonably dangerous to any user or consumer; (3) the plaintiff was a foreseeable user or consumer; (4) the defendant was in the business of selling the product; and (5) the product reached the consumer or user in the condition it was sold." *Bourne v. Marty Gilman, Inc.*, 452 F.3d 632, 635 (7th Cir.2006); *see also* Ind. Code § 34–20–2–1. The critical element is the second one — proving that the product is unreasonably dangerous. A plaintiff can satisfy this element by showing a design defect, a manufacturing defect, or a failure to warn. *Piltch*, 778 F.3d at 632.

### Design Defect Claims

The Timms' first claim is one for defective design. They allege that Harley-Davidson's motorcycle is defectively designed because it lacked TPMS, and they allege

that the Goodyear tire is also defectively designed for reasons that are somewhat unclear to me.[1]

Defective-design claims sound in negligence. *Weigle v. SPX Corp.*, 729 F.3d 724, 734 (7th Cir. 2013). A party alleging design defect "must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product." *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 209 (Ind. 2010) (quoting Ind. Code § 34–20–2–2). The "question is not whether it is possible for something untoward to occur during an accident but whether the design creates unreasonable danger according to general negligence principles." *Pries v. Honda Motor Co., Ltd.*, 31 F.3d 543, 545 (7th Cir. 1994).

In addition to establishing that the product was defective, the plaintiff must also establish that "the defective condition rendered the product 'unreasonably dangerous.'" *Id.* (citing Ind. Code § 34-20-2-1). "Unreasonably dangerous" is any situation in which the product exposes the user to a risk of physical harm beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers. Ind. Code § 34-6-2-146.

The Timms' theory of defect, as it relates to the tire, is that excess flash and a thin strip of chafer rubber caused the tire bead to become unseated. But these alleged

---

[1]At the *Daubert* hearing, the Timms' expert, Woehrle, acknowledged that, as against Goodyear, this was really a case based on a manufacturing defect in the tire. But the Timms' complaint does allege design defect, so I will address that claim as well.

defects strike me as manufacturing defects, not design defects, because they are departures from how the tire was designed. And the Timms don't point to any evidence to the contrary. Indeed, even the Timms' own expert acknowledged this to be the case. According to Woehrle's testimony and report, the alleged defects – excess flash and thin chafer rubber – are the results of the vulcanization process that occur during the tire-making process. Woehrle stated that the bead flash "constitutes rubber that *did not end up where it was designed to be* in this critical bead region of the tire." [DE 306-1 at 36 (emphasis added)]. The excess flash is not supposed to be there and thus has nothing to do with the design of the tire.

The Timms also claim that the Harley-Davidson motorcycle was defectively designed and unreasonably dangerous because it should have been equipped with a TPMS, which would have alerted Mr. Timm to the sudden loss of air in the tire. Their theory is that, if he would have been alerted to the air loss, he could have immediately and safely brought the motorcycle to a stop before he lost control. Thus, the Timms have asserted a design defect claim against Harley-Davidson.

The Timms' design defect claim against Harley-Davidson relies heavily on the proposed testimony of its experts Woehrle and Lee. I have already excluded the testimony of these experts as it relates to TPMS because it failed to comply the requirements of Rule 702 and the *Daubert* standard. In light of this ruling, the record is devoid of any expert evidence showing that the motorcycle was defectively designed. Expert testimony is generally required where the issue is beyond the understanding of a

lay juror. *Piltch*, 778 F.3d at 632-34. Here, the issue of whether Harley-Davidson failed to exercise reasonable care under the circumstances in designing the motorcycle without TPMS is beyond the lay juror's understanding because an ordinary juror would have no knowledge as to the costs, benefits, and risks of developing and installing TPMS on a motorcycle. They would be forced to rely upon pure speculation. Apart from Woehrle and Lee's testimony, there is no other evidence suggesting that the motorcycle was defectively designed because it did not come with TPMS.

But let's suppose that Woehrle and Lee's testimony met the *Daubert* standard, and I allowed this testimony. I would still find that the Harley-Davidson motorcycle was not defectively designed simply because it did not have a TPMS. Just because the inclusion of TPMS into the motorcycle would have made it safer does not mean that the motorcycle was unreasonably dangerous or defectively designed without it. That's because "a manufacturer is under no duty to produce accident-proof products." *Short by Southerland v. Estwing Mfg. Corp.*, 634 N.E.2d 798, 802 (Ind. Ct. App. 1994); *Guerrero v. Allison Engine Co.*, 725 N.E.2d 479, 482 (Ind. Ct. App. 2000). Rather, its duty is to "design and build products which are reasonably fit and safe for the purpose for which they are intended." *Short*, 634 N.E.2d at 802. A product can often be made safer by the introduction of some additional feature. Vehicles with rearview cameras and side airbags are safer than those without them, much as bicycles with training wheels are safer than those without. But it doesn't necessarily follow that, because a product lacks those additional safety features, it is necessarily unreasonably dangerous. Both Dr. Lee

and Mr. Woerhle tacitly acknowledged this principle when they declined to say that a motorcycle without TPMS was defective, unsafe or unreasonably dangerous. [DE 300-1 at 14; DE 301-1 at 709.]

There are also allegations that the motorcycle rim may have been defective. But without Woehrle's opinions, there is no evidence supporting this allegation. In all events, Woehrle never actually opined that the rim was defectively designed. In fact, he said the opposite. [DE 302-1 at 5.] Woehrle did not criticize Harley-Davidson for selecting the Goodyear tire, and he stated that the rim and tire combination, setting aside any alleged manufacturing defect in the tire, was actually a reasonably safe combination. [DE 302-1 at 4.] He opined that it was reasonable for Harley-Davidson to recommend the tire for the Timms' motorcycle. [DE 302-1 at 7.] Woehrle also conceded that the rim complied with specifications called for by the Tire and Rim Association [DE 302-1 at 3], and that the rim had been approved by the Tire and Rim Association for use with the specific Goodyear tire at issue in this case. [DE 302-1 at 4.] So any claim of a design defect in the motorcycle rim is simply unsupported by any evidence.

### Failure to Warn Claim

The Timms next allege various claims of failure to warn against Harley-Davidson and Goodyear. Claims of failure to warn are also evaluated under a negligence standard. Under the IPLA, a product is defective "if the seller fails to: (1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product; when the

seller, by exercising reasonable diligence, could have made such warnings or instructions to the user or consumer." *Weigle*, 729 F.3d at 731 (quoting Ind. Code § 34–20–4–2). "Under Indiana law, there is a duty to warn reasonably foreseeable users of all latent dangers inherent in the product's use." *First Nat. Bank & Trust Corp. v. Am. Eurocopter Corp.*, 378 F.3d 682, 690 (7th Cir. 2004) (internal quotation marks and citations omitted).

The IPLA does not require that the plaintiff show a design defect as a prerequisite to establishing a duty to warn, *Ritchie v. Glidden Co.*, 242 F.3d 713, 724 (7th Cir. 2001), as a product may be defective *because of* the inadequate warnings, *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 161 (Ind. Ct. App. 1997). The duty to warn is twofold: "(1) to provide adequate instructions for safe use and (2) to provide a warning as to dangers inherent in improper use." *Rushford*, 868 N.E.2d at 810. "No additional warnings need to be furnished where such warnings would not supplement the user's understanding of the nature and characteristics of the product." *Weigle*, 729 F.3d at 733.

The Timms suggest that both Harley-Davidson and Goodyear should have warned them about the alleged defects present in the tire, i.e., the excess flash and thin strip of chafer rubber, and of the possibility that the bead could become unseated. With or without an expert, the Timms offered no evidence or opinions as to what a warning should have said, what format a warning should have taken, or where it should have been placed. This type of evidence is indispensable to their claim. *Nissen Trampoline Co. v. Terre Huate First Nat'l Bank*, 358 N.E. 2d 974, 978 (Ind. 1976). Woehrle himself

admitted that he was offering no opinions as to warnings in this case [DE 320-1 at 2], so even if he had been permitted to testify, there is still is no evidence supporting a failure to warn claim.

The Timms also claim that Harley-Davidson and Goodyear had a duty to warn them about past catastrophic accidents wherein a Harley-Davidson motorcycle equipped with a Dunlop D402 tire suddenly deflated, went out of control, and crashed, resulting in serious injury or death to the motorcyclist. Mr. Timm claims that if he would have known of these reported cases of the failure of the tire, he would have chosen a different tire for his motorcycle. But Indiana law can't possibly require a manufacturer to warn consumers about every single accident or injury that's ever occurred in connection with the product. It's well-established that there is no duty to warn just because a product might conceivably cause injury. *Ritchie*, 242 F.3d at 724. The duty under Indiana law is to warn of a product's latent dangerous characteristics. *Id.* Unsubstantiated allegations that some tires have suddenly deflated and caused serious injury to motorcyclists – which it's not even clear has anything to do with the defects the Timms allege caused their accident – do not suffice to show a latent dangerous characteristic present in the tire for which Goodyear and Harley-Davidson had a duty to warn. In any event, the Timms again did not provide the indispensable information as to what the warnings should have looked like.

### *Manufacturing Defect Claim*

Finally, the Timms claim that the tire was defectively manufactured. As I previously explained, their theory is that there was excess flash in the bead area which caused rubber to pull away from the chafer strip. The excess flash and the thin chafer strip diminished the bead's resistance to unseating, which caused the bead to unseat in conditions in which one would normally expect the bead to stay put. When the bead unseated, one half of the tire went into the wheel well and the other half of the bead extended upward above the wheel flange. This caused Mr. Timm to lose control of the motorcycle, resulting in the crash.

To demonstrate a manufacturing defect, the plaintiff must show that the product deviates from its intended design. *Piltch*, 778 F.3d at 633. Expert testimony is often required because the issue of whether a product deviates from its intended design is typically outside of the understanding of a lay juror. *Id.*

As an initial matter, the Timms allege that both Goodyear and Harley-Davidson are liable for this alleged manufacturing defect. Liability against Harley-Davidson appears to be based on the fact that Harley-Davidson imprints its logo on the D402 tire. The Timms do not allege that they purchased the tire through Harley-Davidson (although, they do allege that Harley-Davidson offers the same tire for sale), and they do not allege any facts, or present any evidence, suggesting that Harley-Davidson manufactured the tire. In fact, they state that this tire was a replacement tire, not the original one that came with the motorcycle they purchased.

All of this is neither here nor there because summary judgment is appropriate on the Timms' manufacturing defect claim anyway. As noted earlier, Woehrle's opinions as to the supposed manufacturing defect are unsupported by any indicia of reliability as set forth in *Daubert*. Without expert testimony, the jury would be forced to speculate as to what caused the accident and what may have been wrong with the tire – an issue outside the understanding of an ordinary person. This is impermissible. *See Piltch*, 778 F.3d at 633. The Timms have no other evidence that there was a manufacturing defect that proximately caused their injuries. So summary judgment is required on the manufacturing defect claim as well.

### Miscellaneous Other Claims

Finally, the Timms bring two additional claims against both Goodyear and Harley-Davidson that fail for the same reason — they are not causes of action that are recognized under Indiana law. First, the Timms allege that Goodyear and Harley-Davidson had a duty to cease manufacturing and distribution of the tires and to recall the defective tires already sold. Relatedly, the Timms claim that the defendants negligently failed to recall the tires. However, there is no cause of action under Indiana law for failure to recall. *See Tober v. Graco Children's Prods., Inc.*, 2004 WL 1987239, at *9 (S.D. Ind. July 28, 2004) *aff'd* 431 F.3d 572, 579 (7th Cir. 2005); *see also Fowler v. Werner Co.*, 2014 WL 2605341, at *3 (N.D. Ind. June 10, 2014).

Second, they seem to allege that Goodyear and Harley-Davidson failed to comply with regulatory requirements. As was the case with the claims against the

helmet defendants, the Timms cite to the IPLA as the basis for this claim. Although the Timms don't cite to it, it is true the IPLA contains a provision that provides a rebuttable presumption that a product was not defective, and the manufacturer is not negligent, if the product conformed with applicable codes, standards, and regulations. Ind. Code § 34-20-5-1. There is, however, no rebuttable presumption cutting the other way. In other words, although a defendant gets a presumption when its product complies with applicable standards, a plaintiff doesn't get the benefit of a presumption when a product *doesn't* comply with an applicable standard. And anyways, the Timms also haven't produced any evidence that defendants didn't in fact comply with the regulations to which they are subject. Finally, to the extent that the Timms are alleging this is a separate cause of action, they do not cite to any provision of law or any case recognizing a private right of action.

For all of the foregoing reasons, summary judgment on all of the Timms' claims must be granted.

## Conclusion

Defendant Goodyear Dunlop Tires North America Ltd.'s Motion in Limine to Exclude Testimony of William Woehrle [DE 297] is GRANTED.

Defendant Goodyear Dunlop Tires North America Ltd.'s Motion in Limine to Exclude Testimony of Dr. Daniel Lee [DE 298] is GRANTED.

Defendant Goodyear Dunlop Tires North America Ltd.'s Motion for Summary Judgment [DE 292] is GRANTED.

Defendant Harley-Davidson Motor Company Group LLC's Motion in Limine to Exclude Opinion Testimony of William Woehrle [DE 300] is GRANTED.

Defendant Harley-Davidson Motor Company Group LLC's Motion in Limine to Exclude Opinion Testimony of Daniel Lee [DE 301] is GRANTED.

Defendant Harley-Davidson Motor Company Group LLC's Motion for Partial Summary Judgment [DE 302] is GRANTED.

Defendant Harley-Davidson Motor Company Group LLC's and Goodyear Dunlop Tires North America Ltd.'s Rule 56 Motions to Strike [DE 317, 321] are DENIED AS MOOT.

Defendant Harley-Davidson Motor Company Group LLC's Motion to Strike Plaintiffs' Untimely Affidavit of Daniel Lee [DE 323] is DENIED AS MOOT.

SO ORDERED.

ENTERED: March 29, 2018.     /s/   Philip P. Simon
                             PHILIP P. SIMON, JUDGE
                             UNITED STATES DISTRICT COURT